In the

# United States Court of Appeals

## For the Seventh Circuit

———————————

No. 21-1277

UNITED STATES OF AMERICA,

*Plaintiff-Appellee,*

*v.*

JEFFREY JOHNSON,

*Defendant-Appellant.*

———————————

Appeal from the United States District Court for the
Northern District of Illinois, Eastern Division.
No. 17-cr-770 — **Andrea R. Wood**, *Judge.*

———————————

ARGUED JANUARY 13, 2022 — DECIDED AUGUST 26, 2022

———————————

Before HAMILTON, BRENNAN, and JACKSON-AKIWUMI, *Circuit Judges.*

JACKSON-AKIWUMI, *Circuit Judge.* During a search of Jeffrey Johnson's residence for firearms, ammunition, and related documents, officers seized over 100 grams of a substance containing heroin and furanylfentanyl. Following the denial of his suppression motion, Johnson went to trial and a jury convicted him of intent to distribute a controlled substance containing an analogue of fentanyl, which carries a 10-year

mandatory prison sentence. The district court sentenced Johnson to 132 months' imprisonment. Johnson appeals, raising several challenges to his conviction and sentence. We find no error and affirm.

**I**

On April 5, 2017, FBI agents and the Chicago Police Department executed a search warrant at Johnson's apartment. The search warrant authorized law enforcement to search for:

> Firearms, short barreled, ammunition, paraphernalia for maintaining firearms, any photographs of individuals with firearms, any records of firearms transactions, which have been used in the commission of, or which constitute evidence of the offense of: [unlawful use of a weapon by a felon].

The officers searched Johnson's apartment and did not find any firearms or ammunition. They then searched the back porch attached to Johnson's apartment and found over 100 grams of a substance containing heroin and furanylfentanyl, stuffed inside a sock, concealed in a cavity at the top of a ceiling beam.

Johnson was arrested, and a grand jury returned a one-count superseding indictment charging him with possession with intent to distribute 100 grams or more of a mixture and substance containing a detectable amount of heroin and furanylfentanyl. 21 U.S.C. § 841(a)(1). Possession with intent to distribute at least 100 grams of a substance with a detectable amount of "any analogue of [fentanyl]" carries a mandatory minimum of 10 years' imprisonment. 21 U.S.C. § 841(b)(1)(A)(vi).

Before trial, Johnson filed a motion to suppress the drugs seized from his apartment. He argued that the drugs were found on the porch, which was located outside the apartment and outside the scope of the warrant. The district court found the porch to be curtilage and therefore within the scope of the warrant. The district court denied the motion.

Johnson proceeded to a six-day jury trial. At trial, the district court submitted a special verdict form to the jury addressing the enhanced penalty for offenses involving 100 grams or more of "any analogue of [fentanyl]." The court instructed the jury that "any analogue of [fentanyl]" is defined as "any substance that has a chemical structure that is substantially similar to the chemical structure of fentanyl." Johnson did not object to this instruction.

In the end, the jury found Johnson guilty of possession with intent to distribute 100 grams or more of a mixture and substance containing furanylfentanyl, an analogue of fentanyl. Johnson faced a 10-year mandatory minimum prison sentence. 21 U.S.C. § 841(b)(1)(A).

## A. Motion for Judgment of Acquittal/Motion for New Trial

Johnson filed several post-trial motions. In one post-trial motion, which the district court construed as a motion for new trial, Johnson argued for the first time that furanylfentanyl is not an "analogue of [fentanyl]" within the meaning of § 841(b)(1)(A)(vi), and therefore he was not subject to the 10-year mandatory minimum. Johnson took the position that the word "analogue" as used in § 841(b)(1)(A)(vi) had the same meaning as "controlled substance analogue" in 21 U.S.C. § 802(32)(C)(i), which provides that a scheduled controlled

substance is not a "controlled substance analogue." Because furanylfentanyl is a Schedule I controlled substance, Johnson argued that it cannot be an "analogue of [fentanyl]" under § 841(b)(1)(A)(vi) and that the jury's finding violated the *Ex Post Facto* Clause.

The district court rejected Johnson's argument. The district court concluded that the statutory definition of "controlled substance analogue" in § 802(32) did not apply to the word "analogue" in § 841(a)(1)(A)(vi) which, by itself, is undefined. Applying the ordinary and plain meaning of the term, the district court explained that the definition of "analogue" means "something similar or comparable to something else either in general or in some specific detail" or "a chemical compound that is structurally similar to another but differs slightly in composition." Johnson did not dispute that furanylfentanyl is an analogue of fentanyl under the plain meaning of the word, and this was in accord with the definitional "any analogue of [fentanyl]" instruction submitted to the jury. The district court therefore denied the motion.

Nearly a year after the district court denied this post-trial motion, Johnson filed an amended motion for a new trial making a similar argument regarding the definition of "any analogue of [fentanyl]." The district court denied the amended motion as untimely.

## B. Amended Motion to Suppress

During the sentencing phase, Johnson obtained new counsel and filed an amended motion to suppress. In the motion, Johnson claimed for the first time that the officers exceeded the scope of the search warrant as to the items seized. Particularly, Johnson argued that the warrant authorized officers to

search for firearms and firearm-related items, but the officers searched for anything illegal, including evidence of drugs and stolen vehicles. Johnson also argued that the officers unreasonably searched inside the sock containing heroin and furanylfentanyl because it was too small to have firearms. To account for his untimely motion, Johnson explained that his previous counsel had no "strategic purpose" for failing to raise the issue in his initial motion to suppress, so the omission was "objectively unreasonable."

The district court denied Johnson's amended suppression motion as untimely. The district court found that, based on the available factual record, Johnson could not show ineffective assistance of counsel, and thus, could not establish good cause for the court to consider his untimely motion.

## C. Sentencing

At sentencing, the district court determined that Johnson was a career offender based on two previous state felony convictions for the manufacture and/or delivery of controlled substances.[1] Johnson objected to his status as a career offender. He insisted that he was convicted under an Illinois drug statute that covered a broader array of controlled substances than federal law, and therefore, this conviction could not serve as a predicate offense under the career-offender guideline. The district court rejected this argument based on our decision in *United States v. Ruth*, 966 F.3d 642, 651 (7th Cir. 2020). With the career-offender guideline in place, Johnson's

---

[1] The career offender predicates were Johnson's 2012 conviction for manufacture or delivery of heroin and his 2006 conviction for manufacture or delivery of a controlled substance.

guidelines range was 360 months to life imprisonment. The district court sentenced Johnson to 132 months.

On appeal, Johnson contests the district court's denial of his amended suppression motion, its application of the 10-year mandatory minimum enhanced penalty, and his status as a career offender. We address each argument in turn.

## II

### A. Good Cause for Untimely Motion to Suppress

Johnson first argues that the district court erred in failing to grant his late-filed amended motion to suppress. We review a district court's good cause determination about an untimely motion for abuse of discretion. *See United States v. Jackson*, 5 F.4th 676, 682 (7th Cir. 2021).

A suppression motion filed after trial is untimely, but a court may consider the motion if a defendant shows good cause. Fed. R. Crim. P. 12(c)(3); *United States v. Daniels*, 803 F.3d 335, 351–52 (7th Cir. 2015). A claim of ineffective assistance of counsel might constitute good cause based on a fully developed record. *See United States v. Acox*, 595 F.3d 729, 732 (7th Cir. 2010). But a defendant's counsel's strategic decision not to pursue a claim, or to file a belated claim, is insufficient to establish good cause. *United State v. Boliaux*, 915 F.3d 493, 496 (7th Cir. 2019).

We see no abuse of discretion in the district court's determination that Johnson's motion was untimely and that he otherwise failed to establish good cause. Johnson's motion was filed one year after his conviction. Johnson acknowledges that his motion was untimely but argues ineffective assistance because there was no strategic reason for his prior counsel's failure to make the argument regarding the scope of the items

seized. Although ineffective assistance of counsel may be sufficient to establish good cause in some cases, in this case, it is not. As it currently stands, the record is silent as to prior counsel's decision not to seek suppression on the ground that the officers exceeded the scope of the warrant as it relates to items, so we can only presume Smith's counsel performed within the professional standards. *See United States v. Cates*, 950 F.3d 453, 457 (7th Cir. 2020). Perhaps if, as the district court noted, Johnson had requested an evidentiary hearing to demonstrate how his prior counsel was deficient, then he could have potentially shown enough evidence to rebut this presumption. Absent a record of deficiency or any extrinsic evidence, however, Johnson cannot show good cause for his untimely motion. *See United States v. Taglia*, 922 F.2d 413, 417–18 (7th Cir. 1991) ("When the only record on which a claim of ineffective assistance is based is the trial record, every indulgence will be given to the possibility that a seeming lapse or error by defense counsel was in fact a tactical move, flawed only in hindsight.").

Even if Johnson was able to show good cause for his untimely suppression motion, the search of his residence was lawful. The officers in this case did not, contrary to Johnson's argument, exceed the scope of the warrant. In executing a search warrant, "officers are entitled to search anywhere the items to be seized might likely be discovered, so long as that is within the place authorized to be searched." *Archer v. Chisholm*, 870 F.3d 603, 617 (7th Cir. 2017) (citation omitted). "The objects of the search set the boundaries of the scope." *Id.* ("[i]f you're looking for an adult elephant, searching for it in a chest of draws is not reasonable") (citation omitted). But an officer may also seize evidence that, although not described in the warrant, is subject to seizure under the plain view

doctrine. *United States v. Key*, 889 F.3d 910, 912 (7th Cir. 2018); *Russell v. Harms*, 397 F.3d 458, 465 (7th Cir. 2005). An item falls within the plain view doctrine if: (1) the officer has a legal right to be in the place from where he sees the object subject to seizure; (2) the officer has a lawful right of access to the object itself; and (3) the property's incriminating nature is "immediately apparent." *United States v. McGill*, 8 F.4th 617, 622 (7th Cir. 2021). For an item's incriminating nature to be "immediately apparent," an officer must have "probable cause to believe that the item is contraband or otherwise linked to criminal activity." *Id.*

Johnson contends that the officers' seizure of the drugs went beyond the scope of the warrant, which authorized officers to seize only firearms and related items. Rather, Johnson maintains, the officers searched for anything illegal, including evidence of stolen vehicle and drugs. The record does not support Johnson's contention. There is no dispute that the officers were legally within Johnson's residence. The warrant at issue in this case authorized officers to search Johnson's residence for "[f]irearms [and] ammunition," and "paraphernalia for maintaining firearms … photographs [and] any records of firearms transactions" which could constitute evidence of unlawful use of a weapon by a felon. Some of these items, such as ammunition, could have been found in a ceiling cavity or in a sock, where the drugs were ultimately found. On this record, the incriminating nature of the sock was "immediately apparent" because the officers had probable cause to believe that the sock contained "contraband or [was] otherwise linked to criminal activity." *McGill*, 8 F.4th at 622 (citations and quotations omitted); *see also Texas v. Brown*, 460 U.S. 730, 741–742 (1983) (allowing further investigation to confirm the

incriminating character of seized evidence). The officers' seizure of the drugs was therefore lawful under the plain view doctrine.

## B. Furanylfentanyl as an "Analogue of [Fentanyl]"

Next, Johnson argues that the district court erred in subjecting him to a 10-year statutory mandatory minimum under § 841(b)(1)(A)(vi), because furanylfentanyl is not an "analogue of [fentanyl]" as used in the statute. As a preliminary matter, the government contends that we need not even address this argument because, by not objecting to a jury instruction defining an "analogue of [fentanyl]," Johnson waived this statutory construction argument.

Although failing to object to a jury instruction may generally constitute waiver, *United States v. Morgan*, 929 F.3d 411, 432 (7th Cir. 2019), it is not an automatic bar. *United States v. Natale*, 719 F.3d 719, 731 (7th Cir. 2013) ("[W]aiver is not an absolute bar on our consideration of issues not preserved below … [w]hen the 'interests of justice' so require, we may reach the merits of a waived issue."). Here, we need not decide this issue because even assuming Johnson only forfeited the argument as opposed to waiving it, he cannot survive plain error review.[2]

---

[2] Johnson indicates that he raised the argument before the district court in a post-trial motion. However, his motion raised a slightly different argument under the *Ex-Post Facto* Clause, which the district court considered in full. Of course, had Johnson attempted in a post-trial motion to object belatedly to a jury instruction that had been given without objection at trial, that would be improper. *See, e.g.*, FED. R. CRIM. P. 30(d)("[a] party who objects to any portion of the instructions or to a failure to give a requested instruction must inform the court of the specific objection and the grounds for the objection before the jury retires to deliberate … Failure to

Johnson's statutory construction argument starts with the Controlled Substances Act (CSA), 21 U.S.C. § 801 *et seq.*, which includes both the Anti-Drug Abuse Act of 1986, § 841(b)(1)(A)(vi), and the Controlled Substance Analogue Enforcement Act (Analogue Act), 21 U.S.C § 813. The CSA makes it "unlawful for any person knowingly or intentionally … to manufacture, distribute, or dispense, or possess with intent to manufacture, distribute, or dispense, a controlled substance." 21 U.S.C. § 841(a). The statute defines "controlled substance" as "a drug or other substance, or immediate precursor, included in schedule I, II, III, IV or V of part B of this subchapter." *Id.* at § 802(6).

Under the Anti-Drug Abuse Act, a person who is convicted of having "100 grams or more of a mixture or substance containing a detectable amount of any analogue of [fentanyl]" faces an enhanced penalty of a mandatory minimum prison sentence of 10 years. 21 U.S.C. § 841(b)(1)(A)(vi). Neither § 841 nor the definitional statute for the subchapter, § 802, define "analogue" or "any analogue of [fentanyl]."

Relevant to Johnson's argument, however, the statute does define the term "controlled substance analogue." According to the statute, a "controlled substance analogue" is:

> (i)     the chemical structure of which is substantially similar to the chemical structure of a controlled substance in schedule I or II;

---

object in accordance with this rule precludes appellate review" except for plain error review).

(ii)    which has a stimulant, depressant, or hallucinogenic effect on the central nervous system that is substantially similar to or greater than the stimulant, depressant, or hallucinogenic effect on the central nervous system of a controlled substance in schedule I or II; or

(iii)    with respect to a particular person, which such person represents or intends to have a stimulant, depressant, or hallucinogenic effect on the central nervous system that is substantially similar to or greater than the stimulant, depressant, or hallucinogenic effect on the central nervous system of a controlled substance in schedule I or II.

21 U.S.C. § 802(32)(A). The statute makes clear that the definition of "controlled substance analogue" does not include "a controlled substance." *Id.* at § (32)(C)(i). Furanylfentanyl is classified as a Schedule I controlled substance. *See* 21 C.F.R. § 1308.11(42).

This statutory background provides the basis of Johnson's argument. Johnson argues that "analogue" or "any analogue of [fentanyl]" as used in § 841(b)(1)(A)(vi) means the same, or has the same definition, as "controlled substance analogue." *See* 21 U.S.C. § 802(32). If this is true, then furanylfentanyl, which is a Schedule I controlled substance, cannot be an "analogue of [fentanyl]" under § 841(b)(1)(A)(vi).

The problem for Johnson is that the term "controlled substance analogue" does not appear in § 841(b)(1)(A)(vi) where

the fentanyl analogue language is, and the term is treated separate and apart from "any analogue of [fentanyl]." Congress specifically used the term "controlled substance analogue" in other sections of the statute, *see* §§ 841(b)(7)(A), 861(d)(1), but not the sentencing enhancement provision at issue here. § 841(b)(1)(A)(vi). "Where Congress includes particular language in one section of a statute but omits it in another section of the same Act, it is generally presumed that Congress acts intentionally and purposely in the disparate inclusion or exclusion." *Russello v. United States*, 464 U.S. 16, 23 (1983). Thus, "controlled substance analogue" is not the same as "any analogue of [fentanyl]."

Generally, "[s]tatutory definitions control the meaning of statutory words." *Burgess v. United States*, 553 U.S. 124, 129 (2008). But when a term—here, "analogue" or "any analogue of [fentanyl]"—is not defined, courts look to the plain and ordinary meaning of the term. *Encino Motorcars, LLC v. Navarro*, 138 S. Ct. 1134, 1140 (2018); *United States v. Patel*, 778 F.3d 607, 613 (7th Cir. 2015). To determine the plain meaning of a tern, courts frequently look to dictionary definitions and sometimes consider the construction of similar terms in other statutes, as well as the purpose of the statute being interpreted. *Patel*, 778 F.3d at 613; *see also Chapman v. United States*, 500 U.S. 453, 462 (1991). The district court did not plainly err in doing the same here.

The dictionary defines "analogue" as "a chemical compound that is structurally similar to another but differs slightly in composition." Webster's New Collegiate Dictionary (11th ed. 2020); *see also* Webster's New Collegiate Dictionary (9th ed. 1985) ("a chemical compound structurally similar to another but differing often by a single element of the same

valence and group of the periodic table as the element it replaces."). Johnson does not dispute that furanylfentanyl is an "analogue" based on the plain and ordinary definition of "analogue" and "any analogue of [fentanyl]." Based on the ordinary rules of statutory construction, the district court did not plainly err in defining "any analogue of [fentanyl]" and applying the 10-year enhanced penalty in Johnson's case.

Although, until today, our circuit had not addressed Johnson's statutory construction argument, our sister circuit has (albeit with regards to butyryl fentanyl). In *United States v. McCray*, 7 F.4th 40, 46 (2d Cir. 2021), the Second Circuit specifically rejected the argument that "any analogue of [fentanyl]" should have the same definition of "controlled substance analogue." The court then applied the plain and ordinary meaning of "analogue" to reach a conclusion similar to the one we reach today. We find the reasoning in *McCray* persuasive and further support that the district court did not plainly err in applying the 10-year enhanced penalty in Johnson's case. *See also United States v. Ramirez*, 783 F.3d 687, 694–95 (7th Cir. 2015) ("We rarely find plain error on a matter of first impression [,]" since "[m]atters of first impression are unlikely to be … [sufficiently] obvious"—that is, "so obvious … that [the] district judge should have intervened without being prompted by an objection from defense counsel").

## C. Career Offender Status

Johnson's final contention is that his prior state drug felony convictions do not fall within the career-offender guideline's definition of "controlled substance offense" because the Illinois statute for his two prior convictions covers more conduct than federal law. We review de novo a district court's application of the Sentencing Guidelines, including whether

a prior offense is a predicate "controlled substance offense" under the guidelines. *See United States v. Ruth*, 966 F.3d 642, 654 (7th Cir. 2020).

A defendant qualifies as a career offender under U.S.S.G. § 4B1.1(a) if, as relevant here, "the defendant has at least two prior felony convictions of either a crime of violence or a controlled substance offense." The guidelines define a "controlled substance offense" as:

> an offense under federal or state law, punishable by imprisonment for a term exceeding one year, that prohibits the manufacture, import, export, distribution, or dispensing of a controlled substance (or a counterfeit substance) or the possession of a controlled substance (or a counterfeit substance) with intent to manufacture, import, export, distribute, or dispense.

U.S.S.G. § 4B1.2(b). The guidelines do not define "controlled substance."

Johnson has two convictions for the manufacture and/or delivery of a controlled substance in Illinois. *See* 720 ILCS 570/401. Johnson argues that his state drug felony offenses do not qualify as predicate offenses, because the state statute in question covers a broad range of drugs than those covered by federal law. For this argument, Johnson relies on the CSA's definition of "controlled substances." 21 U.S.C. § 802(6).

Johnson's argument is foreclosed by our decision in *Ruth*, where we noted that the career-offender guideline and its definition of "controlled substance offense" does not incorporate, cross-reference, or in any way refer to the CSA. 966 F.3d at 651–52. We therefore declined to import the federal definition

of "controlled substance" into the guidelines and found the categorical (or modified categorical) approach unnecessary in this context. Rather, we explained that the career-offender guidelines defined the term "controlled substance offense" broadly, so, its definition is most plainly read to "include state-law offenses related to controlled or counterfeit substances punishable by imprisonment for a term exceeding one year." *Id.* at 654 (citation omitted). We determined that the plain and ordinary meaning of "controlled substance" is "any [] category of behavior-altering or addictive drugs, as heroin or cocaine, whose possession and use are restricted by law." *Id.* (citation omitted). Based on the natural meaning, we held that a defendant's Illinois conviction for a drug offense in violation of 720 ILCS 570/401(c)(2) was a predicate "controlled substance offense" under the career-offender guideline. *Id.* So, too, is the case here—Johnson's prior convictions under the same statute, *see* 720 ILCS 570/401(c)(1), are predicate "controlled substance offenses" under the career-offender guideline.

### III

For the reasons stated above, we AFFIRM the district court's judgment.